Kristin Kalani, SBN 030240
Erin Rose Ronstadt, SBN 028362
Kevin Koelbel, SBN SBN 016599
OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745
(602) 761-4443 Fax
kristin@oberpekas.com
erin@oberpekas.com
kevin@oberpekas.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Scott Darnell, a married man, | **No.** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| American Traffic Solutions, Inc. Employee Welfare Benefits Plan, an ERISA benefit plan; American Traffic Solutions, Inc., an ERISA plan administrator; and Life Insurance Company of North America, a plan fiduciary; | |
| Defendants. | |

For his claims against Defendant American Traffic Solutions, Inc. Employee Welfare Benefits Plan Defendant (the "Plan"), Defendant American Traffic Solutions, Inc. ("ATS"), and Defendant Life Insurance Company of North America ("LINA") (collectively "Defendants"), Plaintiff Scott Darnell ("Plaintiff" or "Mr. Darnell") alleges as follows:

### JURISDICTION, VENUE, AND PARTIES

1.      This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").

2.      ATS is the Employer, Plan Administrator, and Plan Sponsor of the Plan.

3.     The Plan and ATS have their principal place of business in the state of Arizona.

4.     The Plan is a single-employer welfare benefit plan under ERISA and is maintained for the exclusive benefit of eligible employees of ATS.  The Plan provides a comprehensive selection of employee welfare benefits including, but not limited to, medical, dental, vision, life, short-term disability ("STD"), and long-term disability ("LTD"), and accidental death and dismemberment.

5.     As the Plan Administrator, Plaintiff is informed and believes that ATS has authority to control and manage the operation and administration of the Plan and the various benefit programs.

6.     ATS administered the Plan to its employees, including Plaintiff.

7.     Plaintiff is a participant and beneficiary of the Plan by virtue of his employment with ATS.

8.     Plaintiff is a married person. He resides in Maricopa, Arizona.

9.     LINA is a licensed insurance company authorized to write LTD insurance policies in Arizona.

10.     LINA is domiciled in the Commonwealth of Pennsylvania and the State of Connecticut and is a wholly owned subsidiary of CG Corporation, a Connecticut holding company. CG Corporation is in turn a wholly owned subsidiary of CIGNA Holdings, Inc., a Delaware holding company. The parent company of CIGNA Holdings, Inc. is Cigna Corporation, a Delaware holding company.

11.     LINA had actual or apparent authority to act as a fiduciary on behalf of the Plan.

12.     Plaintiff is informed and believes that Defendants are licensed and authorized to do business in Maricopa County, Arizona, and reside and are found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

13.     Plaintiff is informed and believes that Defendants are either named fiduciaries of the Plan pursuant to 29 U.S.C. § 1133(2); deemed fiduciaries pursuant to 29 U.S.C. § 1002 (21)(A); or designated fiduciaries pursuant to 29 U.S.C. § 1105(c)(1)(B).

14.     This Court has jurisdiction over the subject matter of this action under ERISA, 29 USC §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

### GENERAL ALLEGATIONS

15.     All previous and succeeding paragraphs are incorporated by reference.

16.     Cigna operates three primary business segments: Global Health Care, Global Supplemental Benefits and Group Disability and Life.

17.     Cigna's Group Disability and Life segment provides insurance products and related services for group short and long-term disability insurance, group life insurance, and accident and specialty insurance. These products and services are provided by subsidiaries of Cigna, including LINA.

18.     Within the Group Disability and Life segment, disability products constitute the majority of the segment's business. As of December 31, 2015, there were approximately 14,300 disability policies in force covering approximately eight million claimants.

19.     According to Cigna's 2015 Annual Report (the "Annual Report"), Cigna's Group Disability and Life segment received $3.9 billion in premiums and fees, which was an 8% increase from 2014.

20.     According to the Annual Report, Cigna's adjusted income from operations was $324 million, which was a 2% increase from 2014. In 2013 and 2014 comparatively, Cigna's adjusted income from operations was $311 million and $317 million respectively.

-3-

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

21.     According to the Annual Report, adjusted income from operations within the Disability and Life segment increased in 2015 compared with 2014 due primarily to favorable life claims experience.

22.     According to the Annual Report, the majority of Cigna's disability products are offered to employers, including sponsors of ERISA employee benefits plans. Cigna represents itself as "an industry leader in returning employees to work quickly." As part of its group disability insurance products, Cigna "provide[s] assistance to employees in returning to work and assistance to their employers in managing the cost of employee disability."

23.     Cigna integrates its disability insurance products with other disability benefit programs, including social security advocacy. Cigna markets its integration approach as a way to reduce the cost of disability events, improve the return to work rate, and "identify, treat and manage disabilities before they become longer in duration or chronic and more costly."

24.     Premiums for the Disability and Life segment are typically collected within the coverage year and then invested in assets that match the duration of the expected benefit payments that occur over many future years. With significant investments in longer-duration securities, net investment income is a critical element of profitability for the segment.

25.     According to the Annual Report, "[t]he effectiveness of return to work programs and morbidity levels impact[s] the profitability of disability insurance products."

26.     The majority of products and services provided through Cigna's Group Disability and Life segment are fully insured, which means that Cigna and/or LINA assumes the risk for any claims and/or costs that arise under the issued disability policy.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

*The Plan*

27.     On January 1, 2009, ATS established the American Traffic Solutions, Inc. Employee Welfare Benefits Plan, Number 501 (the "Plan").  The Plan is a single-employer welfare plan and provides LTD and life insurance coverage to eligible employees.

28.     LTD benefits are provided through a group insurance contract with LINA. In exchange for premiums under group policy number LK-963892 (the "LTD Policy"), LINA agreed to fully insure all LTD claims under the Plan and to assume financial liability for said claims.

29.     To qualify for LTD benefits under the LTD Policy, Plaintiff had to satisfy the definition of "Disability" and had to be continuously Disabled throughout the "Elimination Period."  The Elimination Period is the time, which the participant must be continuously Disabled before benefits become payable.  Under the terms of the LTD Policy, Plaintiff's Elimination Period was 180 days.

30.     Plaintiff's Elimination Period began on February 28, 2014 and ended on August 26, 2014.  His LTD benefits became payable effective August 27, 2014.

31.     For the first thirty-six (36) months, Plaintiff is considered Disabled if he is "unable to perform the material duties of his Regular Occupation" "solely because of Injury or Sickness," and "unable to earn 80% of more of his Indexed Earnings from working in his Regular Occupation."

32.     Thereafter, Plaintiff is considered Disabled if he "unable to perform the material duties of any occupation for which he is, or may reasonably become, qualified based on [his] education, training or experience," and "unable to earn 80% or more of his Indexed Earnings."

33.     Plaintiff's Regular Occupation was the occupation he was "routinely perform[ing] at the time [his] Disability beg[an]."  In evaluating Plaintiff's Disability,

LINA was required to "consider the duties of [Plaintiff's] occupation as it [was] normally performed in the general labor market in the national economy."

34.    If eligible, the LTD Policy provides Plaintiff with a gross disability benefit of 60% of his monthly "Covered Earnings."  The LTD Policy defines Covered Earnings as the "wage or salary as reported by the Employer for work performed … just prior to the date Disability begins."  Plaintiff's Covered Earnings do not include bonuses, commissions, overtime pay or other extra compensation.

35.    LINA reported Plaintiff's Covered Earnings as $5,000/month. It calculated his gross disability benefit as $3,000/month.

36.    Should Plaintiff remain continuously Disabled, he would potentially be entitled to receive LTD benefits for up to 60 months or until August 27, 2019.

37.    The LTD Policy is also coordinated with ATS' life insurance benefits, which are provided through a separate insurance contract with LINA, group policy number FLX-965622 (the "Life Insurance Policy").  Upon a showing of disability, LINA would waive the life insurance premiums owed for coverage.

38.    To qualify for life insurance waiver of premium ("LWOP") benefits under the Life Insurance Policy, Plaintiff must submit proof that he is "Disabled."  He is considered "Disabled" under the Life Insurance Policy if "because of Injury or Sickness, [he] is unable to perform the material duties of his Regular Occupation, or is receiving disability benefits under [ATS'] plan, during the initial 6 months of Disability."  Thereafter, "[he] must be unable to perform all of the material duties of any occupation which he may reasonably become qualified based on education, training or experience, or is subject to the terms of a Rehabilitation Plan approved by [LINA]."

39.    After premiums have been waived for 12 months, "they will be waived for future periods of 12 months, if the Employee remains Disabled and submits satisfactory proof that Disability continues."

40.     Under the Life Insurance Policy, Plaintiff is informed and believes that he had approximately $62,000.00 in basic life insurance coverage, and another $150,000.00 in voluntary coverage.

### *Plaintiff's Claims for STD and LTD Benefits*

41.     Plaintiff began working for ATS on or about July 5, 2011.  He worked as a Violations Processing Supervisor until October 2013, and in November 2013, accepted a promotion as the Operations Supervisor of the Chicago Speed Program. As of his last day worked on February 27, 2014, Plaintiff worked as an Operations Supervisor earning approximately $60,000.00 annually.

42.     As the Operations Supervisor, Plaintiff was required to relocate and work in Chicago, IL.  His key responsibilities included providing daily oversight of the violations preprocessing and call center supervisors, associates, budget and internal/external relationships.  In this capacity, he managed the violation inventory to ensure contract compliance; managed progressive disciplinary procedures with employees and approved timecard and/or work schedules; handled operational questions and concerns; handled escalated customer issues; coordinated departmental functions; and developed strong, positive work relationships with staff, customer and vendors. He staffed the program, oversaw all of the training of leaders and associates, and networked with business partners such as the Chicago Police Department and various staffing agencies.  He was responsible for all technical issues at the desktop, tracking new camera deployments, reporting camera issues, and preparing center reports for Senior Management.

43.     Plaintiff has had a longstanding battle with immunodeficiency issues since September 1989.  Secondary to this and as a result of his immunodeficiency, Plaintiff has contracted various opportunistic infections.  During the pendency of his claim, Plaintiff was diagnosed with coccidioidomycosis or "valley fever," a fungal infection that causes flu-like symptoms such as fatigue, fever, muscle aches, rashes, headaches,

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

and night sweats; cachexia and wasting syndrome, which is characterized by the loss of significant amounts of body mass and fat, causing severe muscle and body weakness; Hepatitis A and B; and Pneumocystis Carinii Pneumonia, a serious infection that causes inflammation and build-up in the lungs.

44.    On March 6, 2014, Plaintiff was hospitalized with complaints of high fever, shortness of breath, night sweats, weight loss, and rashes.  Lab reports revealed dangerously low T cell levels and extremely high viral load counts, confirming severe immunodeficiency.

45.    Because of his worsening medical issues and inability to work, Plaintiff applied for STD benefits under the Plan.

46.    LINA reviewed Plaintiff's eligibility for STD benefits, and in a letter dated March 17, 2014, approved his claim beginning March 7, 2014. As a result of subsequent reviews, LINA extended Plaintiff's STD benefits through August 28, 2014, finding that his STD claim was medically supported through the exhaustion of the STD benefit period, which expired on August 28, 2014.

47.    Throughout his STD claim, Plaintiff provided supporting assessments from his treating physicians, Drs. Dinh and Fisher, in the form of Medical Request Forms ("MRFs").  Plaintiff's physicians provided MRFs on April 10, 2014, April 17, 2014, July 3, 2014, and, again, on August 8, 2014.  Due to his continuing symptoms, Plaintiff's physicians maintained that he could not work.

48.    On or about August 13, 2014, LINA referred Plaintiff's STD claim to nurse case manager ("NCM"), Laura Stalcup, to determine his continuing eligibility for STD benefits. Based on her review of the existing medical evidence, Ms. Stalcup concluded that Plaintiff's disability was supported to September 8, 2014. Her findings and assessment are provided in pertinent part below:

> Reviewed 7/11 and 8/8/14 OVNs [office visit notes] and MRF [medical request form]. verified ICD9, 52yom light occ per CM OOW due to [immunodeficiency], cachexia with r/l of no work also noted on MRF depression, anxiety, nausea,

diarrhea, weakness, cachexia, neuropathy, cognitive decline. ***OVN 8/8 notes weight going down, [immunodeficiency] wasting, wt 147lbs clothed, on exam emaciated***, plan includes diflucan, serostim sw, CD4/Cd8 ratio profile

***Medical supports to 9/8/14 as evidenced above***. If no RTW, CM to outreach for updated OVNs/MRF/lab results

(emphasis added)

49.     In a letter dated August 22, 2014, LINA advised Plaintiff that it was extending his STD benefits through August 28, 2014, the maximum benefit period for his STD claim.  LINA advised that his "claim [was] being transitioned for consideration of [his] eligibility for Long Term Disability benefits."

50.     On September 16, 2014, LINA developed its "Initial Claim Strategy" with respect to Plaintiff's LTD claim.  Based on Ms. Stalcup's NCM assessment finding disability through September 8, 2014, LINA approved Plaintiff's claim for LTD benefits in a letter dated September 16, 2014.  LINA noted, "8/13/14 STD NCM staffing supports to 9/8/14, ***beyond LTD BSD*** [benefit start date.] ***Cm recommends approval per medical that precludes Cx from performing own occ***." (emphasis added)

51.     On or about October 2, 2014, LINA referred Plaintiff to its LWOP Department to evaluate his eligibility for the waiver of his life insurance premiums. In response to its requests, LINA received confirmation from ATS that Plaintiff had basic and voluntary life insurance coverage and that premiums had been paid through September 30, 2014.

52.     In a letter dated October 10, 2014, LINA informed Plaintiff that a LWOP claim had been initiated for him under the Life Insurance Policy as a result of his application for LTD benefits.  Although this coverage was independent from his LTD claim, LINA advised that it would be working in conjunction with the LTD Claim Manager to obtain necessary information.

-9-

53.     The LWOP Department initiated its review of Mr. Darnell's Disability under the Life Insurance Policy.  It sent medical records requests to Dr. Fisher on October 10, 2014 and October 22, 2014.

54.     On or about October 22, 2014, LINA received a Physical Ability Assessment ("PAA") from Dr. Fisher.  In the PAA, which was a form provided by LINA, Dr. Fisher provided his assessment of Plaintiff's "physical abilities" based on Plaintiff's complaints as well as his personal observation and examination of Plaintiff. Dr. Fisher advised that in an eight-hour workday, Plaintiff could only sit, stand, walk and reach ***"occasionally," even allowing for positional changes.*** The form defined occasionally as between zero (0) to two and a half (2.5) hours.  With respect to lifting, carrying, pushing and pulling, Dr. Fisher opined that Plaintiff could only perform these activities occasionally and no more than ten (10) pounds.

55.     In a letter dated October 31, 2014, LINA advised Plaintiff of the outstanding medical records in connection with his LWOP claim.  LINA advised that if it did not receive Dr. Fisher's records by November 29, 2014, it would make a determination based on the information it currently had on file.

56.     Plaintiff responded to LINA's letter.  With his letter, he provided a copy of the PAA from Dr. Fisher. With respect to his medical records, he notified LINA that Dr. Fisher used a third party record management service, Bactes, to process records requests. He advised LINA that Bactes required prepayment before it would release the records. Due to challenges he encountered with Bactes relating to his STD claim, Plaintiff instructed LINA to notify him if it had issues obtaining his records.  LINA received Plaintiff letter on November 14, 2014.

57.     On or about November 13, 2014, LINA followed up with Dr. Fisher's office regarding his outstanding records.  Dr. Fisher's office advised that they had faxed over the PAA, ***but had never received the request for medical records***.  His office advised that it would communicate the request to its medical records staff.  To facilitate

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

the receipt of his records, Plaintiff worked with Dr. Fisher's office. On December 2, 2014, Plaintiff called LINA to let them know that Dr. Fisher had faxed over the information for his claim on December 1, 2014.

58.     On November 14, 2014, LINA received notice from Bactes regarding its inability to process the medical records request for Dr. Fisher. Bactes advised that it required a HIPAA compliant authorization before it could process the request.

59.     LINA followed up with Dr. Fisher's office again on December 2, 2014 and left a voice message. Dr. Fisher's office promptly returned LINA's call and left a return message advising that Bactes handled and processed requests for medical records for his office. They provided the contact information for Bactes. After making contact with Bactes, LINA faxed the request to Bactes.

60.     Plaintiff called LINA on or about December 9, 2014 to confirm its receipt of his medical records from Dr. Fisher. LINA advised that his records were still outstanding. Plaintiff volunteered to work with Bactes to facilitate the timely disclosure of his records.

61.     On or about December 11, 2014, LINA referred Plaintiff 's claim to NCM, Amy Hatcher, to determine whether his LWOP claim was medically supported. Ms. Hatcher reviewed the claim and concluded, "[b]ased on available medical, the PAA dated 12/1/14 from Dr. Fisher is not supported as evidenced by lack of office visit notes since 6/27/14 with which to support his restrictions." Ms. Hatcher agreed to accept the file for outreach and to staff the claim with one of LINA's Associate Medical Directors ("AMD").

62.     On December 15, 2014, Ms. Hatcher faxed a letter to Dr. Fisher's office advising that she had contacted Bactes multiple times, but had not yet received the medical records she requested. Ms. Hatcher asked Dr. Fisher to fax his office notes to help expedite the handling of Plaintiff's claim.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

63.     On December 16, 2014, LINA received an invoice from Bactes for the requested medical records. ***LINA paid the invoice on December 17, 2014***.

64.     **Rather than providing adequate time for the records to come in**, Ms. Hatcher proceeded with her review on December 17, 2014.  This was despite the invoice being paid and knowing that the records were instrumental to evaluating Plaintiff's LWOP claim.  Indeed, Ms. Hatcher had previously emphasized the need for those records. Ms. Hatcher concluded, "Based on available medical, the PAA dated 12/1/14 from Dr. Fisher is not supported as evidenced by lack of office visit notes since 8/8/14 besides ophthalmology with which to support his restrictions. 5/8/14 ON from Dr. Fisher shows cachexia but patient weighs 147 lbs. and denies anorexia. No response from Dr. Fishers [sic] office for clarification of restrictions…"

65.     On December 18, 2014, LINA forwarded Plaintiff's claim to Associate Medical Director ("AMD"), Steven St. Clair.  Without waiting for Dr. Fisher's medical records and without evaluating Plaintiff in-person, Dr. St. Clair agreed with Ms. Hatcher's position and concluded, "Dr. Fishers [sic] opinion is not well supported by medically acceptable clinical, laboratory, and/or imaging findings and is inconsistent with other substantial evidence in the claim file," and therefore, "does not support a significant ongoing physical functional impairment which would preclude [Plaintiff] from performing his own occupational duties on a full time basis."

66.     On information and belief, Dr. St. Clair is board certified in Occupational and Environmental Medicine. He does not have specialty training in infectious disease.

67.     Plaintiff is informed and believes that Dr. St. Clair began working for LINA as an AMD or Medical Director in 2014.  Mr. Darnell is further believes that Dr. St. Clair is an employee of LINA and draws a substantial salary for his employment.

68.     The same day, the LWOP Department requested a "second eye review" with supervisor, Kim McCurdy, who agreed with the decision and approved the denial letter.

69.     In a letter dated December 18, 2014, LINA denied Plaintiff's LWOP claim (the "LWOP Denial"). LINA advised that it was unable to approve his claim for waiver of premium of life insurance coverage, because "there was no current clinical examination findings or imagining [sic] documentation that would support an ongoing functional impairment."

70.     The LWOP decision was immediately shared and communicated with the LTD Department.  On December 18, 2014, Plaintiff's claim was referred to LTD Senior Claim Manager, Jennifer McCarty, for a second eye review. She agreed with the adverse claim determination concluding, "all medical received and reviewed by NCM and AMD. Medical did not demonstrate an ongoing functional loss to preclude cx from performing his own occ. SSA not awarded pending at recon level. OCRs sent by WOP specialist, all attempts to obtain medical have been exhausted and medical deadline has since passed."

71.     In a letter dated December 19, 2014, LINA terminated Plaintiff's LTD benefits effective December 26, 2014 (the "First Denial"). LINA advised that although it had received the PAA from Dr. Fisher indicating less than sedentary ability, it did not receive any office visit notes from Dr. Fisher "with objective findings or measurable functional deficits to correspond with his… provided restrictions and limitations." Based on a review of the available medical information by Ms. Hatcher and Dr. St. Clair, LINA determined that "a functional loss was not present at a level of severity to preclude [Plaintiff ] from performing [his] own [sedentary] occupation as an Operation Supervisor."

72.     Plaintiff was notified about the closure of his LWOP and LTD claims on December 18, 2014.  Upon immediate receipt of this news, he called LINA and demanded an explanation as to why his claims had been closed when LINA had paid the invoice for his records, but did not wait to receive them.  He demanded to speak with supervisors or team leaders for both claims.  Refusing to reopen the claim, LINA

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

informed Plaintiff that as soon as it received the medical records, it would review them with its medical staff to see whether it changed the prior recommendation.

73.     On January 6, 2015, LINA received medical records from Dr. Fisher's office dated June 27, 2014 through December 1, 2014.

74.     On January 7, 2015, Plaintiff's claim was referred to NCM, Shanta Williams, for a "Closed Virtual Staffing" to "Determine Functional Capacity." Ms. Williams accepted the referral on January 8, 2015 and determined that the additional medical evidence "[did] not change prior MD recommendation." Ms. Williams acknowledged that while the clinical evidence "document[ed] some lab abnormalities and exam notes atrophy wasting and reported cognitive deficits," "there [were] no documented physical exam findings or cognitive assessments defining a specific fxn impairment."  Ms. Williams recommended, "further handling to CM."

75.     No further reviews were ordered or conducted by an AMD or supervisor in light of the new records. LINA ignored significant exam findings and failed to obtain complete laboratory tests that had been ordered by Dr. Fisher as referenced in his records.

76.     In a letter dated January 9, 2015, LINA advised that it had received the medical records from Dr. Fisher but that it did not change its prior decision. Because of this, LINA advised that his claim would remain closed and no further action would be taken on his claim.

77.     On January 21, 2015, Plaintiff emailed LINA with his appeal request. On January 29, 2015, he provided LINA with a written statement addressing various points in the LWOP and LTD denials.

78.     In a letter dated January 21, 2015, LINA advised Plaintiff that it found "it necessary to schedule [him] for an Independent Medical Evaluation to clarify [his] functional abilities."  LINA informed Plaintiff that he would receive a letter or phone call from a third party vendor with the date and time of the exam.

79.     Plaintiff retained legal counsel to represent him during the administrative appeal.

80.     In a letter dated, February 9, 2015, Plaintiff's legal counsel provided notice of representation.  In light of Plaintiff's pending appeal, counsel requested a copy of his file and a 90-day extension with which to supplement his appeal.

81.     LINA agreed to suspend its review of Plaintiff's appeal in a letter dated February 12, 2015.  LINA advised that it would remove his claim out of active appeal status, but would reopen its appeal investigation once it received a new appeal request from counsel.  LINA provided the deadline to appeal as June 17, 2015.

82.     With the assistance of counsel, Plaintiff submitted his timely appeal to LINA on June 16, 2015 (the "Appeal"). With his Appeal, Plaintiff provided 1,842 pages of supporting evidence, which included updated medical records from his treating physicians, including records from his recent ***February 2015 hospitalization***, as well as sworn declaration statements and literature about his medical conditions. He also provided information relating to his Regular Occupation from O*NET and the U.S. Bureau of Labor, background information regarding LINA's internal reviewers, and the Regulatory Settlement Agreement between LINA and other state insurance departments.

83.     The Appeal letter explained Plaintiff's medical conditions in great length. It also outlined all of his ***objective medical testing***, including abnormal CD4 and viral load counts confirming severe immunodeficiency; a chest x-ray that showed findings consistent with Pneumocystis Pneumonia; and a lumbar puncture from his February 2015 hospitalization, which confirmed meningitis and normocytic anemia.

84.     LINA confirmed receipt of Plaintiff's Appeal in a letter dated June 17, 2015. Plaintiff's Appeal was assigned to appeals analyst, Sarah Coelho.

85.     On June 24, 2015, Plaintiff's legal counsel provided supplemental assessments from Dr. Fisher in support of his pending Appeal.  Counsel provided a Fatigue Residual Functional Capacity Questionnaire, Pain Functional Capacity

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

Questionnaire, and a Medical Assessment of Ability to Do Work Related Physical Activities.  Dr. Fisher indicated that Plaintiff had **less than sedentary capacity**.  He also noted that Plaintiff had **severe fatigue**, which frequently interfered with his attention and concentration and precluded him from completing tasks in a timely manner.  Dr. Fisher concluded that on the basis of his fatigue, Plaintiff **would not be able to sustain work on regular and continuing basis**.

86.     While his Appeal was pending review, Plaintiff was hospitalized again at John C. Lincoln North Mountain Hospital.  He was admitted on July 9, 2015 and discharged on July 12, 2015 (the "July Hospitalization"). At the time of admission, he presented with nausea, debilitating headaches, visual disturbance, and a 104-degree fever. His appearance was noted as "**thin, cachectic with sunken facial features**, soaphoid abdomen and atrophy of his large skeletal muscles." (emphasis added) He was observed as being in "moderate distress" and with a "stiff neck with increased headache and nausea on anterior flexion." He was referred for further lab work and testing and upon discharge, was diagnosed with "significant immune deficiency," and "resolving meningitis."

87.     In a letter dated July 13, 2015, Plaintiff's legal counsel notified LINA of Plaintiff's July Hospitalization. Counsel provided the contact information for the hospital, and advised that his records had been requested and would be provided upon receipt.

88.     Ms. Coelho referred Plaintiff's claims for file reviews. The file reviews were coordinated through Medical Consultants Network ("MCN").  In the referral instructions to MCN, Ms. Coelho requested that MCN assign the reviews to physicians with Occupational Medicine and Infection Disease backgrounds.

89.     MCN assigned the reviews to Dr. Richard Sall and Dr. Imad Durra.  Dr. Sall purportedly holds board certifications in Occupational Medicine, General Surgery, and Forensic Medicine.  Dr. Durra is purportedly board certified in Infectious Disease.

-16-

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

90.     Dr. Durra completed his initial report on July 28, 2015. Despite noting all of the objective medical evidence in his summary of the medical records, Dr. Durra concluded that Plaintiff was not functionally limited.  It was his position that Plaintiff did not require necessary work activity restrictions.

91.     While Dr. Durra conceded that Plaintiff had "serious medical diagnoses that [could] result in significant limitations," he concluded "there was **no objective evidence** in the medical records of any limitations." Dr. Durra noted that Plaintiff's complaints of fatigue and cognitive dysfunction were made only by **self-report**, and were not substantiated or objectively documented by "exercise tolerance testing," physical examination, or "cognitive testing."

92.     LINA did not instruct Plaintiff to obtain this testing to perfect his claim in the First Denial.

93.     Dr. Durra noted that he was not able to contact Plaintiff's treating physicians by the report deadline, but would provide an addendum to his report once he had received contact from Dr. Fisher or Plaintiff's legal counsel.

94.     Dr. Sall completed his initial file review on August 10, 2015.  Dr. Sall completely ignored the limitations set forth by Dr. Fisher, whom he spoke with separately over the phone in a teleconference.

95.     During the teleconference, Dr. Fisher unequivocally maintained that Plaintiff could not work and had regressed.  Dr. Sall's call summary is provided in relevant part below:

> I called Dr. Fisher on 8/7/15 at 11:45 am and left a message on the voicemail.  Dr. Fisher called me back at 12:15 pm and we discussed the case.
> 1)     Is [Plaintiff] physically functionally limited from 12/18/2014 and continuing?
>         Answer by Dr. Fisher: Yes.
> 2)     Does [Plaintiff] require any medically necessary work restrictions?
>         Answer by Dr. Fisher: Yes. The reasons for his answers were given in the following narrative:
> [Plaintiff] has HIV with the following complications:

- He has poor endurance for work from cachexia because of weakness. He gets up in the morning and takes a nap. He gets up in the afternoon and takes a nap.
- He has memory loss and mental slowing from HIV cognitive dysfunction.
- He has had 2 bouts of encephalitis.
- Any work activities that he would perform would result in low productivity.
- The reason for lapse in his medication was because of financial constraints. He has a high copay for his medication by his insurance company and many times he is unable to purchase it. This is the reason he has gone without medication.

96.     Without having ever evaluated Plaintiff in-person, Dr. Sall concluded that Plaintiff was "able to perform work with restrictions… when compliant with treatment." It was his opinion that Plaintiff was able to work with the following restrictions: No lifting, carrying, pushing or pulling over 10 pounds occasionally; able to sit frequently; able to stand and walk occasionally; no climbing ladders; able to climb stairs occasionally; able to perform balancing, stooping, kneeling, crouching, and crawling occasionally.

97.     The proposed restrictions listed by Dr. Sall are arbitrary, capricious, and not supported by the medical evidence.  His review should not have been considered over the weight of the medical evidence and the opinion of Dr. Fisher.

98.     Dr. Sall's report is replete with internal inconsistencies and should be discredited.  In one area of his report, he noted a purported conflict between the answers provided by Dr. Fisher during the call and Dr. Fisher's office notes relating to Plaintiff's body wasting and weight loss.  Ironically, the office notes that he cites demonstrate fluctuations in Plaintiff's weight and do not show affirmative weight gain.  Despite noting this purported conflict, Dr. Sall later agreed that Plaintiff "require[d] medically necessary work activity restrictions because of muscle wasting and cachexia" based on a 15 pound weight reduction between appointments on November  4, 2014 through January 26, 2015.

-18-

99.     Dr. Sall unreasonably faulted Plaintiff for his failure to take his medications consistently, concluding that his "noncompliance with treatment [was] a major factor."  However, this was belied by the medical records, which substantiated Plaintiff insurance struggles. This was also explained by Dr. Fisher, who clarified that the lapse in medication was due to Plaintiff financial constraints.

100.     Facilitated by Plaintiff legal counsel, Dr. Durra and Dr. Fisher participated in a teleconference on July 30, 2015.

101.     During the teleconference, Dr. Fisher affirmed his support for Plaintiff's claims. He discussed Plaintiff's medical issues including, but not limited to, his fatigue, poor endurance, cachexia, wasting disease, chronic headaches, cognitive dysfunction and cognitive slowing, valley fever, coccidioidomycosis, pneumonia and encephalitis.  He explained Plaintiff's medication challenges and detailed the insurance problems he faced.

102.     During the teleconference, Dr. Durra asked Dr. Fisher whether any exercise tolerance testing had been performed or contemplated to objectively measure Plaintiff's fatigue and poor endurance.  Dr. Fisher replied that he had not, in part, because he relied upon his own physical exam findings.  Dr. Fisher advised that on exam, Plaintiff could not get from sitting to standing without assistance.  Dr. Fisher advised that his quadriceps muscles were weak and that this was consistent with "signs of advanced wasting disease."

103.     Dr. Durra continued to fixate on the lack of purported objective medical evidence stating, "Because you know the objective thing as far as his disabling symptoms, the thing that is most objective and not related to what the patient is reporting, is difficulty standing up from the chair, which is very significant – needing help to stand up from the chair. But, you know, that's probably the only objective thing. Because everything else is by patient report and purely subjective. So that may be an obstacle and ideally I think he would probably need full physiatry or exercise tolerance

-19-

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

evaluation to have measures in terms of how much can he last, how much can he lift, how much can he walk.  And these things can actually be objectively measured…"

104.    Dr. Fisher did not object to the testing proposed by Dr. Durra, but countered that it should be completed at LINA's expense and using a mutually agreeable physician who was not a hired gun for the insurance company.

105.    Dr. Durra summarized his call with Dr. Fisher in an addendum dated August 12, 2015. He did not provide any recommendations to LINA for further testing.

106.    On August 6, 2015, Plaintiff's counsel sent LINA copies of the audio recording and written transcripts from the July 30, 2015 teleconference.  Counsel made a formal request that LINA consider this additional evidence for Plaintiff's pending Appeal.

107.    On August 13, 2015, Plaintiff's counsel provided LINA with Plaintiff's July Hospitalization records.

108.    LINA forwarded the July Hospitalization records to Drs. Sall and Durra to determine whether the new information changed their prior recommendations.

109.    Dr. Sall provided his addendum in a report dated August 25, 2015.  Based on the new information, Dr. Sall **changed his prior recommendation**.  He opined that Plaintiff was "**physically functionally limited from 12/18/2014 and continuing**," and "require[d] medically necessary work restrictions because of multiple causes." (emphasis added) He noted Plaintiff's diagnoses and comorbidities: "The patient currently suffers from cognitive decline, 438.0[;]" "Pulmonary coccidiomycosis, 114.5[;]" Cachexia and wasting disease, 799.4[;]" "He suffers and is treated for severe peripheral neuropathy, 357.4[;]" He has been treated for syphilis[;]" "He has chronic hepatitis B."  Because of these issues and Plaintiff's repeated infections, Dr. Sall concluded that he had **no work capacity** from July 9, 2015 and continuing.  He stated, "In my opinion, [Plaintiff] is **not able to work because of cognitive decline from brain damage secondary to AIDS and meningitis**." (emphasis added)

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

110.     Pursuant to LINA's request, Dr. Durra completed his addendum on August 26, 2015.  Dr. Durra reviewed Plaintiff's July Hospitalization records and noted, "[h]is physical examination show the patient not to be febrile, thin and cachectic, muscle atrophy is noted, moderate distress, photophobia is noted, along with vomiting. The neck is stiff."  Dr. Durra noted Plaintiff's discharge diagnosis as "meningitis, likely a recurrence of coccidiomycosis meningitis."  Against the weight of the medical evidence, Dr. Durra determined that this information did not change his prior recommendation. His explanation is provided in pertinent part below:

> Based on all of the very extensive medical records that I have seen, more than 400 pages, along with my telephone discussion with Dr. Fisher, **I cannot find any objective evidence of physical or cognitive impairment**. It is true that the claimant has a potentially serious medical illness, which is uncontrolled HIV, but this does not automatically mean that he has impairing conditions. The extra medical records that I have obtained pertain to an acute illness for which he was hospitalized for three days, and do not pertain to the claimant's chronic, ongoing medical condition. Obviously, time off while being hospitalized and for up to one week of discharge recovery is warranted, but nothing long term.

(emphasis added)

111.     LINA referred the claim back down to Dr. Sall for a second addendum to purportedly clarify Plaintiff's restrictions and limitations.  At LINA's request, Dr. Sall completed the second addendum on September 1, 2015. Dr. Sall concluded that while Plaintiff was "unable to work from 7/9/15 [the date of his hospitalization] and continuing," he could allegedly work from December 18, 2014 through July 8, 2015. Dr. Sall did not provide any explanation for this arbitrary distinction.

112.     On or about September 1, 2015, LINA referred Plaintiff's claim to Vocational Rehabilitation Counselor ("VRC"), Paul Wilson, for an Occupational Analysis ("OA"). Mr. Wilson accepted the referral.

113.     In the referral instructions to Mr. Wilson, he was to provide an OA based on Dr. Sall's "PR [Peer Reviewer] Occ Med Clarification dated 9/1/15."

114.     Mr. Wilson summarized the R&Ls set forth by Dr. Sall as:

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

> The claimant is unable to work from 7/9/15 and continuing.
> From 12/18/14 to 7/8/15, the claimant could work with the following restrictions no lifting, carrying, pushing or pulling over 10 pounds occasionally, sit frequently, stand and walk occasionally, no climbing ladders…

115.   Using the Dictionary of Occupational Titles (the "DOT"), Mr. Wilson classified Plaintiff's occupation as a sedentary strength occupation, which required "lifting, carrying, pushing or pulling up to 10 pounds occasionally with mostly sitting." Based on this, he concluded that the R&Ls set forth by Dr. Sall were consistent with Plaintiff's occupation as a "Customer Service Representative Supervisor" from 12/18/14 to 7/8/15, but not from 7/9/15 and forward.

116.   The DOT was a publication produced by the United States Department of Labor, which helped employers, government officials, and workforce development professionals to define over 13,000 different types of work. It was first published in 1938. The last government published version of the DOT was published in March 1999.

117.   The DOT is outdated and is not a reliable source for understanding occupations in today's general labor market.  In 1998, it was replaced by the Occupational Information Network or O*NET.  The DOT has been rendered obsolete and has been abandoned by the Employment Service and the Department of Labor.

118.   In a decision dated September 2, 2015, LINA affirmed and upheld its prior decisions to terminate Plaintiff's claim for LTD benefits effective December 18, 2014, and to deny his waiver of premium claim (the "Final Denial").  Despite acknowledging Plaintiff's hospitalizations in February and July 2015, LINA concluded that the restrictions and limitations provided by its consultants allowed him to work in his own occupation as of December 18, 2014.  Because of this, LINA concluded that his inability to work was not supported beyond this date.

119.    To support its Final Denial, LINA relied exclusively on the evidence it gathered on appeal, including the reports provided by Drs. Sall and Durra and the OA provided by Mr. Wilson.  LINA did not provide any meaningful explanation as to why it

relied on its physician reviewers' reports over and to the exclusion of Dr. Fisher or why it found their opinions more credible.

120.    The Final Denial did not comport with the notice requirements under ERISA. ERISA requires a "meaningful dialogue" between a claims administrator and a beneficiary. Under 29 C.F.R. § 2560.503(g)(iii), when a plan administrator denies a claim, the notification must provide "a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." It must also be relayed in a manner calculated to be understood by the claimant. LINA failed to identify what was needed for Plaintiff to perfect his claims despite multiple requests for this information.

121.    Since his last day worked, Plaintiff has remained Disabled under the LTD and Life Insurance Policies.

122.    Plaintiff has seen various specialists for his symptoms without relief.

123.    Plaintiff cannot perform the material duties of his Regular Occupation or Any Occupation.

124.    Plaintiff has exhausted his administrative remedies under the Plan.

125.    Plaintiff satisfied all of the jurisdictional prerequisites to filing his claims, and his claims are timely before this Court.

126.    On information and belief, Plaintiff may be entitled to additional benefits from ATS and/or LINA as a Disabled employee including, but not limited to, life insurance and retirement/pension credits.

## COUNT I
### (Recovery/Reinstatement of Plan Benefits)
### (The Plan & LINA)

127.    All previous and succeeding paragraphs are incorporated by reference.

128.    The Plan provides LTD coverage and a promise to pay benefits until Plaintiff is no longer Disabled under the terms of the LTD Policy.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

129.   The Plan also provides life insurance coverage and a promise to waive premiums while Plaintiff was Disabled under the terms of the Life Insurance Policy.

130.   Plaintiff became Disabled in March 2014 and continues to be Disabled. Due to his medical conditions and the supporting medical evidence, Plaintiff would not be able to perform his Regular Occupation or Any Occupation. He has claimed the benefits under the Plan to which he is entitled.

131.   Plaintiff reasonably expected that his conditions met the requirements of Disability as defined by the LTD Policy, and that he would receive benefits until he was no longer Disabled or until August 27, 2019.

132.   Despite the coverage of Mr. Darnell's Disability, LINA improperly terminated Plaintiff's LTD benefits in breach of the Plan.  LINA also improperly denied Plaintiff's LWOP claim in breach of the Plan. LINA's breaches were arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and clearly erroneous.

133.   On information and belief, LINA's conduct was motivated by financial considerations, caused by its structural conflict of interest as both decision-maker and payer/insurer of Plaintiff's LTD and life insurance benefits. LINA has failed to produce any evidence that it protected Plaintiff from its conflict and instead intentionally withheld information that would have otherwise revealed the depth of its self-interested conduct.

134.   LINA has a demonstrated history of biased and parsimonious claims handling.  In 2013, LINA was the subject of several state insurance investigations by California, Connecticut, Maine, Massachusetts and Pennsylvania (the "Monitoring States").  These investigations revealed systematic irregularities in LINA's claims handling practices related to group LTD insurance policies, and culminated in the May 2013 Regulatory Settlement Agreement (the "RSA").  LINA and other Cigna companies became the subject of and signatories to the RSA.  LINA was assessed with monetary penalties, was forced to reopen several years' worth of denied claims under a

-24-

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

remediation program, and was required to set aside $77 million for projected payments to claimants whose claims were improperly denied or terminated.  Based on its prior conduct, LINA was also required to make specified changes to its claims reviewing procedures (the "Enhanced Claims Procedures"). The Enhanced Claims Procedures mandate certain standards for evaluating claims, including the appropriate use of external medical resources.

135.    Under the Enhanced Claims Procedures, relevant medical documentation should be drawn from multiple sources and should be given proper consideration. Relevant medical documentation, includes but is not limited to, medical records from treating providers, medical texts, articles, and other publications, the claimant's own statements, and observations of the claimant's activities. LINA only considered the reports provided by its physician consultants. LINA ignored credible evidence, which was supplied during the administrative appeals process. During this process, Plaintiff provided updated medical records, articles and literature about his conditions, and sworn testimony regarding his functionality and difficulties with activities of daily living. He also provided assessments from Dr. Fisher.

136.    The procedures outline that when LINA's opinion regarding the claimant's functionality differs from the claimant's treating provider, contact with the treating provider should be made to clarify functional discrepancies.  Contact can be made either by phone or by letter requesting clarification.  If telephone contact cannot be arranged, a letter outlining the question(s) and issues should be sent to the treating provider, which invites a reply either by phone or by letter.

137.    If these efforts do not resolve questions of functional status and level of impairment, the use of external resources, such as an Independent Medical Examination ("IME") and/or Functional Capacity Evaluation ("FCE"), should be considered and/or employed to gain further understanding of the claimant's functional capacity. IMEs and FCEs should be ordered when there are disputed or unclear medical conditions,

-25-

functional status, or levels of impairment. A Peer Review may also be considered, but should be reserved only where there is an issue of data interpretation and an in-person examination of a claimant would not be useful to understand the cause and nature of impairment.

138.    Under the Enhanced Claims Procedures, an IME or FCE of the claimant should be sought whenever there is lack of agreement and the opinion of the company's internal medical resource is the primary basis for the denial or termination of benefits.

139.    With respect to Plaintiff's claim, LINA failed to follow the Enhanced Claims Procedures outlined under the RSA. While an insurer is generally not required to seek an in-person examination under ERISA, LINA's failure to do so in this case weighs in favor of finding an abuse of discretion. This is a case where an IME would have helped to determine Plaintiff's level of function.  LINA chose not to exercise this option and, instead, terminated denied Plaintiff's LWOP claim and terminated his LTD benefits. Plaintiff's treating physicians opined that he could not work. The only evidence initially concluding that he was not Disabled was LINA's internal medical resources, Ms. Hatcher and Dr. St. Clair.

140.    On information and belief, LINA had the authority to order an IME or FCE **prior to** denying Plaintiff's LWOP claim and terminating his LTD benefits.

141.    On information and belief, LINA's employees were financially incentivized to deny Plaintiff's claim for benefits. Plaintiff is informed and believes that LINA incentivizes its employees to "manage" claims in LINA's best interests, including but not limited to his claims.

142.    LINA ignored credible medical evidence, which supported Plaintiff's LTD and LWOP claims. LINA disregarded critical medical records from Plaintiff's treating providers as well as other relevant information regarding his symptoms, his medication intolerance and side effects, and his difficulties with activities of daily living.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

143.   Given Plaintiff's worsening health issues, he cannot engage in his Regular Occupation or Any Occupation.

144.   LINA acted arbitrarily and capriciously in evaluating Plaintiff's claims. It selectively reviewed his medical records, unreasonably disregarded supporting documentation during the appeal process, and failed to procure necessary medical reviews by qualified reviewers, both internally and externally.

145.   Drs. Sall and Durra intentionally misstated the medical evidence and the assessments of Mr. Fisher's treating providers.

146.   Drs. St. Clair, Sall, and Durra cherry-picked Plaintiff's medical records to create a selective and incomplete rendition of his medical history.

147.   LINA improperly failed to consider Plaintiff's subjective complaints, as well as the side effects of his medications, in determining whether he was Disabled under the LTD and Life Insurance Policies. Plaintiff's complaints were credible and accepted by his treating physicians. LINA has not articulated compelling reasons for discounting his subjective complaints.

148.   LINA failed to explain why it credited its consultants' opinions over Plaintiff's treating physicians. LINA unreasonably relied on its consultants' reports and addendums when it knew they had conducted inadequate and biased reviews.

149.   Dr. St. Clair did not have the requisite knowledge, experience or training to opine on Plaintiff's medical conditions or ability to work and should not have been considered over the weight of his treating providers.

150.   LINA unreasonably credited unreliable evidence over reliable evidence in its administration and review of Plaintiff's claims, making its determination contrary to the clear weight of the medical evidence.

151.   LINA deliberately conducted biased investigations. It avoided and unreasonably failed to review all of the medical evidence fully and fairly in an effort to avoid financial liability on his claims.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

152.    LINA used personnel and reviewers who lacked adequate training and experience to evaluate Plaintiff's claims.

153.    LINA engrafted additional requirements onto the LTD and Life Insurance Policies that were not contemplated by the parties or required by the Policies, including but not limited to its requirement for "objective" evidence. LINA rejected Plaintiff's medical records based on his "self-reported complaints." However, the LTD and Life Insurance Policies do not have an objective medical evidence requirement. There is no exclusion or limitation for self-reported symptoms. Even when Plaintiff presented objective medical evidence, LINA unreasonably ignored it.

154.    LINA produced incomplete claims procedure guidelines and failed to indicate which procedures were relied upon in its denial of Plaintiff's benefits.

155.    Because of LINA's improper conduct, Plaintiff was denied full and fair reviews of his claims.

156.    Plaintiff is informed and believes LINA managed his claims with the intent to deny his LWOP coverage. The record supports that LINA placed its financial interests above Plaintiff's best interests in administering his claims.

157.    LINA's bad faith and structural conflict is also evidenced in part by its many procedural irregularities. LINA's procedural irregularities include but are not limited to: behaving as an adversary bent on denying his claims; impermissibly "cherry picking" only evidence favorable to LINA from Plaintiff's file; failing to credit Plaintiff's subjective complaints and improperly demanding objective evidence; and failing to provide a rational explanation as to why Plaintiff was no longer Disabled, when LINA previously paid the claim and the medical evidence had not changed.

158.    In determining whether LINA abused its discretion in terminating Plaintiff's LTD benefits, the Court will consider whether his condition ***improved or substantially changed*** between the time LINA initially deemed him eligible for benefits and the time it reversed its decision.  LINA failed to explain how Plaintiff's impairment

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

or clinical picture had changed in any way. LINA's inferences are without support in the record and patently unreasonable.

159.    On information and belief, LINA provided Drs. Sall and Durra with its internal notes, which was a procedural violation of ERISA. It did nothing to insulate the appeal process from the initial determinations. *See 29* C.F.R. 2560.503-1(h)(3)(ii)(h)(4) (requiring claim fiduciaries to "[p]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual.").

160.    In the event ATS properly delegated LINA with discretionary authority, LINA's numerous procedural errors rise to the level of a "wholesale and flagrant" violation of ERISA, entitling Plaintiff to *de novo* review with a bench trial on the record.

161.    If LINA is entitled to review under an abuse of discretion standard, this Court should review LINA's decisions with heavy skepticism, because there is ample evidence of LINA's malice, self-dealing, and biased claims handling as a result of its conflicted status.

162.    On information and belief, LINA has not established any safeguards to insulate its decision-making process against its significant structural conflict of interest.

163.    Plaintiff afforded LINA every opportunity to act prudently and to fairly consider his claims but instead, LINA pursued a predetermined path to deny his claims, regardless of the medical evidence provided on appeal.

164.    Pursuant to the coverage provided under the Plan and under ERISA 29 U.S.C. § 1132(a)(1)(B), Plaintiff is entitled to recover all benefits due under the terms of the Plan, and to enforce his rights under the Plan.

165.    Plaintiff is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of his

disability benefits. He is entitled to a restoration of the *status quo ante* before his benefits were wrongfully terminated.

166.    Pursuant to 29 U.S.C. § 1132(g), Plaintiff is entitled to recover his attorneys' fees and costs incurred herein from LINA.

167.    Plaintiff's is also entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid in full.

## COUNT II
### (Breach of Fiduciary Duty under 29 U.S.C. § 1132(a)(3))
### (LINA & ATS)

168.    All previous paragraphs are incorporated by reference.

169.    Under 29 U.S.C. § 1132(a)(3), a civil action may be brought by a participant "to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or to obtain other appropriate equitable relief" to redress violations of ERISA or the plan.

170.    Under ERISA, a fiduciary owes a special duty of loyalty to the Plan and its Participants. Under 29 U.S.C. § 1104(a)(1)(A), "a fiduciary shall discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries."

171.    ERISA also requires a fiduciary to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aim." 29 U.S.C. § 1104(a)(1)(B).

172.    LINA owed fiduciary duties to Plaintiff, and breached those duties by acting directly against Plaintiff's interests for its own gain. LINA failed to administer the Plan prudently and in Plaintiff's best interests. It failed to present the medical facts accurately and failed to provide a fair and reasonable evaluation, which considered all available medical evidence, both objective and subjective, that supported impairment.

173.    On information and belief, LINA's conduct was motivated by financial

-30-

considerations, caused by its structural conflict of interest as both decision maker and payer/insurer of Plaintiff's LTD and life insurance claims. LINA has failed to produce any evidence that it protected Plaintiff from its conflict and instead intentionally withheld information that would have otherwise revealed the depth of its self-interested conduct.

174.    LINA was unjustly enriched as a result of its breach of fiduciary duty violations to Plaintiff, because it wrongfully withheld benefits for its own profit.

175.    For LINA's conduct, Plaintiff is entitled to equitable relief, which could take the form of injunctive or mandamus relief.

176.    LINA owed a duty of loyalty to Plaintiff but instead acted with bad faith, which constitutes a violation of its fiduciary duty. Plaintiff is informed and believes that LINA managed his claims with the intent to deny his claims in order to avoid financial liability. The duty of loyalty prohibits LINA from favoring its own interests over Plaintiff's.

177.    On information and belief, LINA does not have proper safeguards to ensure that its focus on profitability does not affect how its employees handle, evaluate, and assess claims.

178.    On information and belief, as an institution, LINA uses claim payment reduction goals and cost containment measures as a method of profitmaking for the company. In doing so, LINA unfairly and arbitrarily reduces or denies payments on legitimate claims in an across-the-board fashion to attain its numerical reduction goals. LINA's cost containment measures are consistent with and part of a corporate-wide plan and scheme.

179.    On information and belief, LINA offers incentive or bonus programs to award and encourage employees to meet its savings and operational goals. This includes variable compensation to its claims managers, appeals analysts, and internal clinical staff including, but not limited to, Ms. Hatcher, Dr. St. Clair, and Ms. Coelho.

180.    On information and belief, LINA instructs and/or incentivizes its employees

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

to terminate otherwise legitimate claims, including Plaintiff's.

181.    Under ERISA, a plan administrator and/or insurance company engages in a fiduciary act when making a determination about whether a claimant is entitled to benefits under the terms of the plan.

182.    LINA arbitrarily and capriciously terminated/denied Plaintiff's claims, which constitutes a breach of fiduciary duty.

183.    Plaintiff relied on the Plan to his detriment, believing that he was entitled to LTD benefits and life insurance coverage pursuant to the provisions of the Plan.

184.    In addition to injunctive and/or mandamus relief, Plaintiff may be found to be entitled to surcharge as a result of the actual harm he suffered. As a result of LINA's breaches, Plaintiff depleted his savings and sold everything of value that he owned. He had to forego necessary medical treatment including, but not limited to, his antiretroviral medications. He is now facing the foreclosure of the home that he has lived in for over nineteen years.

185.    Surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position he would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.

186.    The fact that surcharge takes the form of monetary compensation does not remove it from the scope of appropriate equitable relief.

187.    In equity, the Court could make Plaintiff whole following LINA's breach and mold the relief to protect the rights of Plaintiff. The Court has broad discretion to fashion appropriate relief.

188.    On behalf of the Plan, this Court should enjoin LINA as most appropriately determined upon further discovery, as well as provide other equitable relief this Court deems appropriate.

189.    As the Plan Sponsor and Administrator, ATS retained ultimate responsibility and authority regarding the administration of the Plan. Because of its continued responsibility, ATS has a responsibility to review LINA's behavior as a fiduciary of the Plan.

190.    ATS acted imprudently by failing to oversee LINA's claims administration. ATS, as the Plan Administrator, knew or should have known that LINA handled claims against the best interests of its employees and not pursuant to the Plan.

191.    On information and belief, ATS, as the Plan Administrator, did not periodically review LINA's actions as a purported delegated fiduciary under the Plan.

192.    On information and belief, ATS' failure to periodically review LINA's actions as a delegated fiduciary under the Plan was unreasonable and constituted a breach of fiduciary duty.

193.    On information and belief, if ATS did periodically review LINA's actions as a delegated fiduciary under the Plan, then its periodic reviews were unreasonable and constituted a breach of fiduciary duty.

194.    On information and belief, ATS is liable for LINA's actions, because ATS violated its fiduciary obligations by failing to protect the Plan and Plan Participants from LINA's conflicted, unchecked and adversarial claims handling.

195.    On information and belief, ATS knew or should have known that LINA improperly handles claims insured under the LTD Policy in an effort to avoid financial liability on LTD claims.

196.    ERISA "does not elsewhere adequately remedy" the injuries caused to Plaintiff by Defendants' breach of fiduciary duty violations. Even if Plaintiff were to recover the benefits due to his under 29 U.S.C. § 1132(a)(1)(B), this would not provide an adequate remedy for the injuries he sustained.  Furthermore, there would be nothing precluding or estopping LINA from engaging in the same imprudent claims practices that it has engaged in. This is especially true if Plaintiff's claims are remanded back down to

-33-

LINA for further proceedings regarding his eligibility for benefits.

197.    Plaintiff is entitled to equitable relief for Defendants' breach of their fiduciary duties, including for the breaches committed by any agents or third parties for LINA and the ATS. This includes MCN and Drs. Sall and Durra.

198.    Because Defendants breached their fiduciary duties, Plaintiff was actually harmed.

199.    Pursuant to 29 U.S.C. § 1132(g), Plaintiff is entitled to recover his attorneys' fees and costs incurred herein from Defendants.

200.    LINA must return any benefits or profits resulting from its breach to Plaintiff.  By terminating Plaintiff's claim for LTD benefits, LINA was unjustly enriched.

201.    As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiff suffered actual financial harm and incurred financial expenses.

202.    Plaintiff is entitled to injunctive and/or mandamus relief under 29 U.S.C. § 1132(a)(3). He is entitled to enjoin any act or practice by LINA and/or the ATS that violates ERISA or the Plan, and he is entitled to other appropriate equitable relief that is traditionally available in equity.

WHEREFORE, Plaintiff prays for entry of judgment against Defendants as follows:

A.    For all past LTD benefits under the terms of the Plan;

B.    For an award of prejudgment interest on his LTD benefits at the highest legal rate until paid in full; and

C.    Clarifying and determining his rights to future benefits under the terms of the Plan;

D.    For reinstatement of his coverage under the Life Insurance Policy;

D.    For all other equitable relief that is proper as a result of Defendants' breach of fiduciary duties;

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

E.    For an award of his attorneys' fees and costs incurred herein;

F.    For such and further relief as the Court deems just and reasonable.


Dated this 11th day of April, 2016.


OBER & PEKAS, PLLC


By: *s/ Kristin Kalani*
    Kristin Kalani
    Erin Rose Ronstadt
    Kevin Koelbel
    Attorneys for Plaintiff

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-35-